Walter M. Mason (Utah State Bar No. 16891)
DEWSNUP KING OLSEN WOREL HAVAS
201 South Main Street, Suite 1200
Salt Lake City, Utah 84111
Telephone: (801) 533-0400
wmason@dkow.com

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| J.L. and K.S.,<br><br>     Plaintiffs,<br><br>v.<br><br>JARED GARCIA, SHARON D'AMICO, DERICK ZORN, JARED BEERS, MATTHEW COOMBS, CASEY GEHMAN, DAVID HARDY, SPENCER KILPACK, SIONE TUIPULOTU, and JOHN DOES 1-10<br><br>     Defendants | **COMPLAINT AND JURY DEMAND**<br><br>Case No.:  2:26-cv-00404<br><br>Judge: |

Plaintiffs complain of Defendants and, demanding trial by jury, allege as follows:

### INTRODUCTION

1.     This civil rights action is brought to redress the systemic sexual assault, humiliation, and intimidation inflicted upon Plaintiffs while in the custody of the Utah Department of Corrections (UDC) at the Utah State Correctional Facility (USCF).

2.     The conduct by officers and administrators was directly contrary to extensive efforts by the Utah Legislature to ensure safety and accountability in Utah's prisons.

1

3.      At USCF, Plaintiffs were subjected to a pervasive culture of sexual misconduct where male officers—including specifically Defendants Kilpack and Tuipulotu—exploited their authority to groom, sexually abuse, and assault female inmates in known surveillance blind spots.

4.      When inmates repeatedly reported this abuse, Defendants did not protect Plaintiffs. Instead, UDC supervisors—including Defendants Garcia, D'Amico, Zorn, Beers, Coombs, Gehman, and Hardy (the "Supervisor Defendants")—orchestrated a campaign of intimidation, retaliation, and humiliation. This included a prison-wide mass strip search where imprisoned women were forced to strip naked, squat, cough, and urinate into a cup while fully visible to male guards and male supervisors.

5.      After the mass strip search, Plaintiffs were subjected to further retaliation and intimidation in response to reported sexual assaults and their attempts to assert their rights to be free from illegal and unconstitutional searches. In striking violation of her constitutional rights, Plaintiff J.L. was placed in punitive maximum security isolation for four months without due process, which resulted in the rescission of her release date and the confiscation of her personal property.

6.      Plaintiffs seek compensatory and punitive damages, attorney fees, and other relief for violations of their rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution, and Article 1 § 9 of the Utah Constitution.

### JURISDICTION AND VENUE

7.      This action arises under the United States Constitution and the Utah Constitution.

8.      This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

9.      While disputing its applicability and constitutionality, Plaintiffs have complied with the Utah Governmental Immunity Act; a Notice of Claim was timely served upon the proper parties, and the statutory period for response has expired.

10.     The acts of the Defendants described herein were undertaken by the Defendants under color of state law, particularly the statutes, ordinances, regulations, policies, customs, practices, and usages of, and under the authority of, the UDC and the State of Utah, and the individual offices of Defendants as officers, agents, and employees of the UDC and the State of Utah.

11.     Under protest—and asserting the inapplicability and the unconstitutionality of the purported statutory requirements—Plaintiffs have filed a notice of bond and notice of undertaking, pursuant to Utah Code §§ 78B-3-104 and 63G-7-601.

## PARTIES

12.     Plaintiffs J.L. and K.S. are individuals who reside in Salt Lake County, Utah. At all times material to this lawsuit, Plaintiffs were incarcerated at USCF in Salt Lake City, Utah.

13.     Defendant State of Utah operates the UDC and maintains the USCF. It is responsible for the implementation and establishment of policies, procedures, and customs, and the supervision and training of officers, agents, and employees assigned to work at the USCF.

14.     Defendant Jared Garcia was at all material times a resident of Utah and the Executive Director of UDC. He is responsible for the overall operation of the prison system, including policy implementation overlapping with the federal Prison Rape Elimination Act of 2003 ("PREA"), as required under Utah Code § 64-13-47. On information and belief, Defendant Garcia authorized, condoned, and ratified the mass strip search.

3

15.     Defendant Sharon D'Amico was at all material times a resident of Utah and the Warden of USCF. She was at all relevant times responsible for the safety of inmates, training and supervision of staff under her command, security protocols, staffing deployments, and overall day-to-day operations of USCF. On information and belief, Defendant D'Amico planned, directed, supervised, and participated in the mass strip search, and specifically condoned, permitted, and ratified the viewing of naked women by male guards.

16.     Defendant Derick Zorn was at all material times a resident of Utah and a Deputy Warden of USCF. He was at all relevant times responsible for the safety of inmates, training and supervision of staff under his command, security protocols, staffing deployments, and overall day-to-day operations of USCF. Defendant Zorn participated in and directed the mass strip search and, personally, for no legitimate penological purpose, viewed naked incarcerated women who were being subject to the mass strip search.

17.     Defendant Captain Jared Beers was, at all relevant times, a supervisory official with direct oversight over housing unit operations. Defendant Beers directed or ratified the retaliation against Plaintiffs, participated in and directed the mass strip search, and—for no legitimate penological purpose—viewed naked incarcerated women who were being subjected to the mass strip search.

18.     Defendants Lieutenant Matthew Coombs, Lieutenant Casey Gehman, and Sergeant David Hardy were residents of Utah and were supervisory officers at USCF who, on information and belief, directed or ratified the retaliation against Plaintiffs, participated in and directed the mass strip search, and—for no legitimate penological purpose— viewed naked incarcerated women who were being subjected to the mass strip search.

19.    Defendant Officer Spencer Kilpack was a correctional officer at USCF who used his authority to coerce and sexually assault Plaintiff J.L.

20.    Defendant Officer Sione Tuipulotu was a correctional officer at USCF who used his authority to coerce and sexually assault Plaintiffs J.L., K.S., and other incarcerated women.

21.    Defendants John Does 1–10 were correctional officers and supervisors at USCF, including Critical Incident Response Team (CIRT) officers, whose identity is not currently known to Plaintiffs and who engaged in the unconstitutional conduct described herein.

## FACTUAL ALLEGATIONS

### Background of Deliberate Indifference

22.    The USCF, which opened in July 2022 at a cost exceeding $1 billion, was specifically designed and constructed around an architectural model of "direct supervision."

23.    The fundamental premise of direct supervision requires the physical presence of correctional officers within the inmate housing pods to monitor behavior, maintain sightlines, and ensure safety.

24.    Because the facility was architecturally designed for direct human supervision, it lacked the centralized sight lines of traditional prison designs.

25.    The direct supervision model depends on adequate staffing to maintain inmate safety. Despite this need, the Supervisor Defendants operated USCF at critically deficient staffing levels.

26.    In the absence of adequate staffing, preventing abuse of inmates and other dangers to inmates required substantially increased camera monitoring.

27.     By operating a direct-supervision facility without the required direct-supervision personnel or appropriate camera monitoring, the Supervisor Defendants created countless operational blind spots.

28.     The Supervisor Defendants possessed actual, subjective knowledge that the combination of understaffing and the lack of comprehensive camera coverage created dangerous, unmonitored blind spots throughout USCF.

29.     Defendant Garcia assumed the role of Executive Director in June 2023 and was, along with the other Supervisor Defendants, extensively briefed on ongoing legislative audits, historical staffing shortages, National Institute of Corrections (NIC) audit recommendations, and previously identified blind spots.

30.     As found in a legislative audit dated November 2023, Report #2023-17 (the "Audit") (emphases added):

a.  "Without Full Staffing, Design of Prison Reduces Safety and Security of USCF."

b.  "Direct supervision is an inmate behavior management model that places officers inside the housing unit with inmates and encourages frequent interaction. USCF was designed with direct supervision in mind but doing so greatly increased the need for more staff. Despite the Utah Department of Corrections' (UDC) awareness of this staffing need and recruitment and retention challenges, previous UDC leadership failed to sufficiently plan for the increased number of staff required at the new facility and a negative culture at UDC amplifies the existing staffing problems at USCF."

c.  "**USCF's warden shared that he believes staffing shortages are a primary reason for recent officer assaults that have taken place at USCF, as well as frequent**

6

**inmate-on-inmate assaults. UDC is aware of this but must make drastic changes to address these concerns.**"

d. "While UDC has taken steps to implement direct supervision at USCF, additional action is needed should it choose to continue with the model. Addressing the deficiencies in UDC's implementation of direct supervision principles while also increasing staffing levels will assist UDC in its effort to operate the facility as intended."

e. **At the time of the audit, the actual staffing level at USCF was 323, while the estimated full staffing need was 895**, leading auditors to conclude that "USCF Staffing Levels Fall Far Short of Estimated Need."

f. "We found that current staffing levels fall far short of the estimated need and an increasing prison population is beginning to aggravate the already tenuous staffing crisis."

g. "This lack of planning by previous UDC leadership is a serious shortcoming that is affecting operations in serious and, at times, dangerous ways."

h. "Despite UDC's awareness of recruitment and retention challenges, we found that UDC management's actions to address staffing needs before moving to USCF were minimal."

i. "UDC has not been staffed adequately since 2013 and while it has made efforts to recruit and retain officers, these efforts have not been targeted or strategic when implementing a philosophy and moving to a new prison that required more staff. This was a major shortcoming that has led to dangerous and harmful outcomes. Since the

move to the new prison, staffing challenges have become exponentially more difficult at USCF, reaching crisis levels."

j. "The move from Draper to USCF took place at the beginning of fiscal year 2023. Rather than increasing hiring to meet the increased demand for COs [correctional officers] at the new prison, UDC lost 91 more officers than it had hired in fiscal year 2022 (the year leading up to the move)."

k. "According to turnover data, since 2019, a majority of Draper/USCF COs leave the department within the first three years."

l. UDC implemented a modified staffing plan, and the "Modified Staffing Plan Increases the Risk of Incidents at USCF."

m. "The modified staffing plan removes multiple supervision posts. As a result, one officer supervises two sections at once in most housing units. **This results in one officer supervising a total of 128 inmates in a general population area. . . . In contrast to USCF's current modified staffing, NIC research indicates that one officer can usually supervise 64 inmates effectively in direct supervision. Without the required number of officers to supervise and monitor inmates, both staff and inmates are put at greater risk of death or injury within the prison.**"

n. The audit concluded that "prison population has grown and with current staffing levels, USCF is experiencing an overcrowding issue."

o. "[The] audit found that a negative culture at the Utah Department of Corrections (UDC) amplifies staffing problems at the Utah State Correctional Facility (USCF). This includes a historic status quo mindset, staff feeling unsupported by leadership and poor communication contributing to a lack of trust."

p. "An organizational culture survey that [the auditors] conducted for this audit reveal[ed] that nearly half of UDC staff do not feel that senior leadership strives for excellence and innovation nor are staff given opportunities to innovate. In addition, multiple survey responses expressed frustration that their concerns and ideas had not been seriously considered by leadership and that management is disconnected from the work staff do."

q. "[The audit] found multiple instances where UDC leadership has exhibited a reluctance to consider new ways of doing things—a status quo mindset. In [the auditors'] opinion, this status quo mindset has stalled UDC's ability to overcome challenges in a meaningful way. It has caused issues like staffing shortages . . . to worsen and affect UDC's culture, job satisfaction, and production, which has led to reduced safety and security at the Utah State Correctional Facility (USCF)."

r. "UDC currently has no existing retention plans to date and explained that no significant targeted effort was placed on recruitment and retention because the need was not there, and although UDC has rarely been fully staffed, it was an accepted notion that vacancies will fill themselves. UDC seems to have a mindset that it will make do with the staff it has."

s. "With extreme staffing shortages at USCF, scheduling innovations and strategy is imperative. Unfortunately, UDC has exhibited a status quo mentality in its scheduling approach and has kept the same strategy it has always used. . . . When describing the challenges of supervising  inmate movement with current staffing, one lieutenant lamented how unsafe it is."

t.  The audit revealed that "unplanned sick leave has been used at a sharply increasing rate since UDC moved to its new site. This appears to be a symptom of staff burnout and low morale at USCF. UDC's complacency in addressing these underlying issues is another example of a status quo mindset that has permeated UDC leadership for a long time and aggravates the challenges of staffing shortages."

u.  The auditors stated that they were "**concerned that a negative organizational culture is impeding UDC's ability to operate USCF in a safe and secure manner**."

v.  The negative organizational culture was confirmed by UDC staff interviews conducted by the auditors. Many UDC staff "raised concerns about a lack of support and ineffective communication from senior leadership."

w.  The negative culture was so pervasive and serious that "many staff did not feel safe meeting for a confidential interview [with auditors] due to past experiences of retaliation for raising concerns. In addition, 36 percent of surveyed staff said mistakes bring punitive rather than corrective action, which suggests management is not using errors as opportunities to train."

x.  The audit quoted UDC staff members as follows:

I.  "**Senior leadership is dismissive of staff and ignores critical issues to make the department seem better than it actually is.**"

II.  "It would be helpful if leadership would sit down with those they supervise and have discussions on what is and is not working within the unit and then finding solutions to those problems together. **There are a lot of problems within this prison with simple fixes, but it feels like no one is doing anything to help improve our processes and procedures**."

10

y. "Poor communication contributes to a negative culture at UDC and widens the divide between staff and senior leadership. . . . 60 percent of UDC respondents said strategies are not shared with staff. Additionally, 65 percent do not feel they receive clear information on changes in the organization."

z. The auditors stated that they "spoke to some members of management who shared that safety was paramount, but this is not reflected in UDC's strategic plan. **The absence of safety and security in UDC's strategic plan is a missed opportunity to promote a safety mindset in all department activities**. We recommend that UDC include safety and security as core values of its organization and disseminate these values throughout its chain of command."

31. Despite possessing actual, documented knowledge of serious staffing shortages, unsafe conditions for inmates, exploitable blind spots, and understaffing, the Supervisor Defendants exhibited deliberate indifference by failing to take adequate measures to abate the risk.

32. The Supervisor Defendants did not supplement cameras or staffing in sufficient ways to remedy dangerous blind spots.

33. The Supervisor Defendants' failures to adequately ensure the safety of inmates reflect their deliberate indifference toward the inmates' clearly established rights.

34. As described below, multiple guards sexually assaulted multiple inmates on a near-daily basis over a period of months; throughout the period of abuse, multiple inmates reported the assaults to officers; and numerous officers knew that the abusive guards were routinely and habitually acting inappropriately with opposite gender inmates. This pervasive, continuous, and long-lasting abuse could only exist in a facility with fundamentally flawed oversight and deliberately indifferent supervision.

35. The Supervisor Defendants maintained a policy, custom, and practice of understaffed personnel moving throughout isolated, unmonitored zones where violent or sexual assaults was exceedingly likely, in direct contravention of clearly established law.

36. The Supervisor Defendants maintained a policy, custom, and practice that officers were to minimize complaints about abuse and punish inmates who reported abuse. This policy, custom, and practice was in contradiction of Utah Admin. Code R251-714-3, Utah Admin. Code R251-714-4, Utah Code § 64-13-47, and other applicable Utah law, administrative rules, and UDC written policies.

37. The Supervisor Defendants maintained a policy, custom, and practice that improper conduct, either observed or reported, should be swept under the rug.

38. The Supervisor Defendants maintained a policy, custom, and practice specifically concerning complaints of sexual assaults where: (1) inmates attempting to make reports of sexual assaults would be told that "PREA violations" are not "grievable"; (2) staff did not disclose to inmates an alternative channel for reporting sexual assaults and other sexual abuses; (3) inmates were denied requests to access materials about reporting sexual assaults; (4) reports of sexual abuse by guards would be met with hostility, punishment, and interrogation; and (5) inmates, and specifically survivors of sexual assault by guards, were deprived of the rights and protections set forth in Utah Admin. Code R251-714-3, Utah Admin. Code R251-714-4, and Utah Code § 64-13-47.

39. The inevitable and obviously foreseeable consequence of the Supervisor Defendants' deliberate indifference as described herein was that inmates would be assaulted by other inmates and by guards.

40.    The inevitable and obviously foreseeable consequence of the Supervisor Defendants' derelict policies regarding the reporting of sexual assaults was that inmates subject to sexual assaults would continue to be assaulted repeatedly, rather than swift accountability being provided for guards and a return to safety being ensured for inmates.

41.    As of the date hereof, guards openly and brazenly taunt inmates and dismiss their concerns about sexual safety and privacy rights, telling them that "we don't have to follow PREA," despite the constitutional rights and numerous provisions under Utah law and administrative code that protect inmates equally or equivalently to PREA. This blatant disregard of clearly established law is the direct consequence of the unconstitutional and deliberately indifferent policies, practices, and customs created, ratified, and condoned by the Supervisor Defendants.

**The Assaults by Defendant Kilpack**

42.    Beginning in January 2025, while Plaintiff J.L. was housed in section DLS-1, Defendant Kilpack began grooming Plaintiffs J.L. and K.S.

43.    Defendant Kilpack groomed K.S. to pass notes and facilitate Kilpack's contact with Plaintiff J.L.

44.    Defendant Kilpack brought gifts to Plaintiffs J.L. and K.S. and other inmates, including energy drinks, gum, and colored pens, to cultivate a coercive relationship. Kilpack also gave Plaintiff J.L. an extra-large gray t-shirt, his religious garments, perfumes, and a sleeve of suboxone.

45.    Beginning approximately February 9, 2025, Defendant Kilpack began sexually assaulting Plaintiff J.L., including touching her breasts, kissing, digital penetration, and receiving fellatio. These acts occurred in blind spot areas that Defendants knew were out of sight of surveillance cameras, specifically on inmate beds obscured by pony walls.

13

46.     Defendant Kilpack's sexual abuse of J.L. occurred virtually every day that he worked, from early February until early April. These were not isolated, unpredictable instances. Defendant Kilpack engaged in a systematic, habitual, near-daily sexual abuse of Plaintiff J.L.

**The Assaults by Defendant Tuipulotu**

47.     Beginning around February 9, 2025, Defendant Tuipulotu began sexually assaulting Plaintiff J.L. and her roommate, Plaintiff K.S.

48.     Over a period of approximately six to eight weeks, from early February until April, Tuipulotu subjected Plaintiffs J.L. and K.S. to repeated sexual assaults, including digital penetration and forcing them to perform oral sex on each other while he watched. Tuipulotu also exposed his genitalia through his pants to Plaintiffs J.L. and K.S. and stimulated himself in front of them.

49.     Tuipulotu exploited known physical "blind spots" in the facility to assault Plaintiffs J.L. and K.S.

50.     Tuipulotu used threats to ensure compliance, telling Plaintiffs J.L. and K.S. "It's your turn next," and threatening them to "save that man's career" (referring to Kilpack) and "you better not get me into trouble."

51.     Tuipulotu also took personal belongings from Plaintiffs J.L. and K.S., which they were entitled to have and were not contraband, with the purpose of coercing and intimidating them.

52.     At the time of the assaults, Defendant Tuipulotu was not assigned to the housing section of Plaintiffs J.L. and K.S. Rather, his normal assignment was in the men's section. To gain access to incarcerated women, Defendant Tuipulotu routinely volunteered for overtime shifts in which he would have access to the women's section, giving him the opportunity to sexually assault

women. On virtually every overtime shift, Defendant Tuipulotu had access to these women and sexually assaulted them.

53.    In addition to Plaintiffs J.L. and K.S., Defendant Tuipulotu repeatedly sexually assaulted numerous other inmates.

54.    Defendant Tuipulotu sexually assaulted Jane Doe #1 repeatedly from approximately February to March 2025.

55.    Defendant Tuipulotu sexually assaulted Jane Doe #2 repeatedly from February to May 2025.

56.    On information and belief, Defendant Tuipulotu sexually assaulted numerous other inmates throughout his employment at USCF, including numerous assaults after the Supervisor Defendants knew and should have known that Defendant Tuipulotu posed an imminent threat to incarcerated women.

### The Reporting and Knowledge of Abuses Committed by Kilpack and Tuipulotu

57.    From January to April, other prison staff and supervisors repeatedly found Defendant Kilpack in Plaintiff J.L.'s section, even though he was assigned to a different section. Specifically, Defendant Kilpack was assigned to section 3, while Plaintiffs J.L. and K.S. resided in section 1. Despite his assignment to section 3, Defendant Kilpack left his assigned area and went to Plaintiffs' section nearly every day through January, February, and March of 2025. Defendant Kilpack entered section 1 approximately once an hour throughout his shifts.

58.    Defendant Kilpack's activity of repeatedly going outside his assigned section to section 1 was logged, viewed on cameras, observed by other officers, and known to supervisors, including each of the Supervisor Defendants.

15

59.     Defendant Kilpack's pattern of unnecessarily entering section 1 was, on its own, substantial evidence of Kilpack's dangerous and inappropriate behavior, which provided notice to each of the Supervisor Defendants of an imminent and severe, ongoing threat of profound harm to the inmates of section 1.

60.     The Supervisor Defendants each acted with deliberate indifference towards this substantial risk of the violation of inmates' constitutional rights, condoning and ratifying the custom that officers were permitted to go virtually anywhere they wished, contrary to their assignments, without accountability.

61.      Defendant Kilpack was repeatedly seen personally and on surveillance video moving with Plaintiff J.L. to camera blind spots where he could sexually assault her. On information and belief, the Supervisor Defendants each observed or received reports of Defendant Kilpack's inappropriate and furtive conduct.

62.     After seeing Kilpack and Plaintiff J.L. together in February 2025, Defendant Hardy ordered Plaintiff J.L. to get on her bunk and accused her of "flirting with Kilpack." On information and belief, Defendant Hardy put a disciplinary note in Kilpack's file about flirting with Plaintiff J.L. On information and belief, this disciplinary note was reviewed by Defendants D'Amico, Coombs, Gehman, and Beers. Despite this clear signal of inappropriate conduct, Kilpack was permitted to continue working in the unit where he subsequently sexually assaulted Plaintiff J.L.

63.     On one occasion in March 2025, Officer Burbidge was outside by the ice machine and watched Defendant Kilpack go into the blind spot of Plaintiff J.L.'s quarters. While Defendant Kilpack was sexually assaulting Plaintiff J.L., Officer Arroyo walked into Plaintiff J.L.'s quarters and told Defendant Kilpack that "Burbidge wants you to know that this is not your section." On

16

information and belief, Officer Burbidge and Officer Arroyo informed one or more of the Supervisor Defendants about this specific example of Kilpack's inappropriate conduct.

64.     On information and belief, multiple inmate reports were made to guards in February, March, and April of 2025 that sexual assaults were being committed against Plaintiffs J.L. and K.S. by Defendants Kilpack and Tuipulotu. Those reports include, without limitation, that Jane Doe #4 repeatedly reported to Defendants Gehman and Beers that Defendants Kilpack and Tuipulotu were sexually assaulting Plaintiffs J.L. and K.S.

65.     Defendants Gehman, Hardy, Beers, and multiple John Doe Defendants personally observed Defendant Kilpack inappropriately travelling to section 1, spending excessive time at the guard desk with Plaintiff J.L., and repeatedly going to the bunks of Plaintiffs J.L. and K.S.

66.     Defendants Gehman, Hardy, Beers, and multiple John Doe Defendants personally observed Defendant Tuipulotu taking women to protected, unseen areas and inappropriately lurking in women's bunk areas.

67.     The reports of sexual misconduct were escalated to one or more of the Supervisor Defendants. Specifically, Utah Admin. R251-714-3(4)(a) required that officers report "any knowledge, suspicion, or information regarding an incident of sexual assault in a correctional facility to the Executive Director or designee," which was Defendant Garcia or his designee. Nonetheless, no action was taken upon these complaints until two inmates made a complaint in front of Sergeant Gates, at which time the conduct of Kilpack was officially investigated, resulting in the termination of Kilpack's employment.

68.     Defendants Captain Beers and Lieutenant Gehman were directly informed by other inmates of the sexual misconduct occurring in the unit. On information and belief, Defendants Garcia, D'Amico, Coombs, and Hardy personally received reports of the sexual misconduct.

17

Despite these reports—and contrary to Utah Admin. Code R251-714-3, Utah Admin. Code R251-714-4, Utah Code § 64-13-47, and Plaintiffs' clearly established constitutional rights—Defendants D'Amico, Coombs, and Hardy failed to initiate investigations or protect Plaintiffs, allowing the abuses to continue.

**Defendants' Retaliatory Response to the Reporting of Sexual Assaults**

69.     Official investigations into the sexual assaults of Plaintiff J.L. by Kilpack began in April 2025 after the reporting by two inmates in an Offender Management Review (OMR) meeting in the presence of Seargent Gates. After this investigation began, Defendants Beers, Coombs, Gehman, and Hardy engaged in systematic retaliation against Plaintiff J.L. for her status as a victim and witness. Plaintiff J.L. was removed from her housing by Sergeant Thomas and Officer Howard, stripped naked, and placed in maximum security (DLS-6) without a disciplinary hearing. On information and belief, this retaliation was done at the direction of, or with ratification by, Defendant D'Amico and one or more of the other Supervisor Defendants.

70.     On approximately April 8, 2025, Plaintiff J.L. learned that Kilpack had been fired because of his misconduct with Plaintiff J.L.

71.     Plaintiff J.L. was interviewed by officers of the Law Enforcement Bureau (LEB). During the interview, Plaintiff J.L. was chained to a chair, with shackles on her ankles, her arms cuffed, and a restraint across her abdomen. Subsequently, officers believed to be employed by the State Bureau of Investigation (SBI) informed Plaintiff J.L. that they had video recordings of Plaintiff J.L. exposing her nude body to Kilpack and that Kilpack's religious garments were found in Plaintiff J.L.'s personal property.

72.     At the end of May 2025, Plaintiff J.L.'s fears of extreme retaliatory isolation were realized: She was placed in maximum security for no legitimate penological purpose. She was held

in punitive maximum security (DLS-6 and DHS-3) for approximately four months. During this time, her phone privileges were limited to 100 minutes/month, and she was denied access to programming required for her parole, which resulted in her release date being rescinded.

73.     While Plaintiff J.L. was in segregation, UDC staff seized her personal property. Instead of storing it, staff marked items such as a TV, radio, and clothing as "disposition/donate" without Plaintiff J.L.'s consent, effectively stealing over $1,000 worth of property.

74.     Plaintiff J.L. requested to be placed on an OMR, which was critical to ensure access to services and privilege levels. On information and belief, one or more of the Supervisor Defendants personally participated in the decision to deny those requests or ratified that denial. Officer Pulliam documented in Plaintiff J.L.'s file that she would not be seen in OMR for six months.

75.     On September 24, 2025, Plaintiff J.L. reported further misconduct via the PREA hotline. Officer Peay intercepted the call/message. Peay physically removed Plaintiff J.L. from her unit, placed her in a holding cell, and interrogated her, demanding she reveal details of the abuse ("was it over the clothes or under?") before Peay would allow her to speak to the designated PREA coordinator, Doug Fawson.

76.     On numerous occasions, Plaintiff J.L. sought information about her rights under PREA and its equivalents; in response, officers refused to provide information and yelled at her. Plaintiff J.L. sought mental health assistance to address the trauma of her sexual assaults by Defendants Kilpack and Tuipulotu. Those requests were declined. On information and belief, this conduct was pursuant to the customs of USCF and the training provided by the Supervisor Defendants named herein, and was ratified and condoned by the Supervisor Defendants.

77. Utah Admin. Code R251-714-3 required UDC and USCF (a) to provide inmates, including Plaintiffs, "easy to understand information developed by the Department on sexual assault prevention, treatment, reporting, and counseling"; (b) to provide "safety and care for victims of offender sexual assault"; (c) to prohibit "retaliation and disincentives for reporting sexual assault"; (d) to provide "acute trauma care for sexual assault victims"; (e) mandate that employees "report any knowledge, suspicion, or information regarding an incident of sexual assault in a correctional facility to the Executive Director or designee, and require disciplinary action for employees who fail to report as required." Each of these requirements was violated, pursuant to unconstitutional policies, procedures, and customs that, with deliberate indifference to inmates' clearly established rights, the Supervisor Defendants created, condoned, and ratified, including that:

a. Inmates were denied access to materials about their rights and protections concerning sexual assaults, bodily privacy, and reporting sexual assaults and violations of bodily privacy. These denials include removing written materials from the library of resources available to inmates and refusing verbal requests for information.

b. Plaintiffs J.L. and K.S. were not provided safety and care after the reporting of sexual assaults by Defendants Kilpack and Tuipulotu.

c. Plaintiffs J.L. and K.S. were retaliated against and disincentivized from reporting, including by placing Plaintiff J.L. in punitive isolation without due process.

d. Plaintiffs J.L. and K.S. were not provided acute trauma care.

e. Guards were not mandated to report their suspicions of Defendants Kilpack and Tuipulotu, nor were the guards with knowledge and suspicion of those abuses subject to any discipline for their failures to report.

78. The conduct described above was designed to cover up abuses, to maintain the reputation of the UDC and its staff, and to subvert and chill the lawfully and constitutionally protected right to report sexual assaults. The direct and obviously foreseeable consequence was the sexual assault of inmates.

### The Mass Cross-Gender Strip Search

79. Beginning on May 13, 2025, at approximately 6:30 a.m., UDC executed a mass operation referred to by staff as a "Reset" or "Raid," targeting women's housing units, including DLS and DHS sections.

80. On information and belief, the mass cross-gender strip search was to humiliate, intimidate, and silence women in retaliation of the reporting of sexual assaults by officers and to prevent further reporting of sexual assaults. The reasons and justifications offered by the Supervisor Defendants for the mass cross-gender strip search are pretexts.

81. The operation was led by Deputy Warden Zorn and Warden D'Amico, accompanied by a force of approximately 20 to 30 CIRT officers. On information and belief, the raid was directed, authorized, and/or ratified and condoned by Defendant Garcia.

82. CIRT officers burst into Plaintiff J.L. and K.S.'s units. Plaintiffs J.L. and K.S., along with over 100 other women in their units, were "processed" as described below. In addition to the raid on Plaintiffs' units, officers also, on information and belief, raided other units of the prison in a similar fashion.

83. Officers aggressively stormed the dormitories, shouting profanities and issuing conflicting orders. Inmates were given approximately 30 minutes to pack all personal belongings into totes and change into state-issued uniforms.

21

84.     During this initial phase, women were denied privacy and forced to change their clothing in the immediate presence of male CIRT officers, who stood feet away and observed them undressing.

85.     Inmates were subsequently marched to the Emerald building for processing, which included body scanning, urinalysis (UA), and strip searches.

86.     The strip searches were conducted in a room within the Emerald building that had floor-to-ceiling windows spanning the entire width of the room, facing a hallway and an identical room across the hall.

87.     These windows provided an unobstructed view from the hallway and the opposing room into the cells where women were being strip-searched.

88.     The cells within the search room were utilized with their doors left open, exposing naked women to the view of other inmates, staff in the room, and individuals in the hallway, including men.

89.     An overhead observation booth with reflective glass overlooked the strip search areas, and inmates observed movement inside, indicating they were being watched from above. On information and belief, Defendants Beers and Coombs were inside the booth.

90.     Despite the fact that the searches were of women, male officers and staff were present inside the strip search room, in the immediate hallway, and in the opposing room throughout the operation.

91.     Deputy Warden Zorn was frequently observed standing at the desk inside the strip search room or in the hallway, facing the open cells and directly observing women in various states of undress.

92.     Warden D'Amico was also present, standing with Deputy Warden Zorn and observing the searches while conversing with male staff. Warden D'Amico stood in the hallway, aware that male officers were viewing naked female inmates, which she ratified, condoned, and failed to stop.

93.     Male CIRT officers and other male guards, including those identified by name as Scade, Eberly, Everett, and Burbidge, roamed freely through the search room, the hallway, and the adjacent waiting rooms, having direct visual access to the naked women.

94.     The women were forced to strip completely naked in the open cells.

95.     The search protocol required the women to lift their breasts, spread their buttocks, and cough while facing open areas visible to male staff and other inmates.

96.     Women who were menstruating were ordered to remove tampons or pads in full view of others.

97.     Women were denied sanitary disposal options for their feminine hygiene products and were forced to hold soiled pads in their hands while performing physical maneuvers for the search.

98.     Following the visual strip search, the women were uniformly denied requests to put on clothing before providing a urine sample.

99.     The women were forced to sit on toilets or squat to provide urine samples while completely naked, in full view of male officers and other inmates.

100.    Officers used abusive and vulgar language during the operation, referring to inmates as "bitches" and using expletives.

101.     Officer Hernandez repeatedly made loud, mocking comments about needing "shears" to "cut them down" in case inmates decided to hang themselves, pantomiming a hanging gesture.

102.     Many of the women observed that officers conducting the strip searches had their body cameras active, with red lights visible, and were told by officers that the cameras were on "for safety," raising fears that footage of their naked bodies was being recorded.

103.     Women, including Plaintiffs J.L. and K.S., who expressed distress or requested privacy were threatened with disciplinary action, "holding cells," or write-ups.

104.     One woman was physically slammed against a wall and shackled until her ankles bled for allegedly not moving fast enough.

105.     There was no exigent circumstance justifying the manner in which the raid was conducted, including the presence of male officers, in violation of PREA and Utah equivalent standards and the protections of the Utah and United States Constitutions.

**Exhaustion of Administrative Remedies**

106.     Plaintiff J.L. reported the abuses described above to officials of the USCF.

107.     Plaintiffs have diligently exhausted all administrative remedies. Plaintiffs were repeatedly told by Defendants that PREA violations, including sexual assault, are "non-grievable." Specifically, on October 24, 2025, Plaintiff J.L. was given an unsigned letter—printed on letterhead identifying that it was from the office of Jared Garcia, Spencer Turley, Aimee Griffiths, and Sharon D'Amico—stating that PREA violations are "non-grievable" [sic].

108.     In the same letter, the office of Jared Garcia, Spencer Turley, Aimee Griffiths, and Sharon D'amico informed Plaintiff J.L. that her grievances were rejected because "there is no record of you raising any Grievance concerns relating to PREA or other issues with your OMR

team" and instructed her to "[p]lease meet with your OMR team to discuss your various concerns of PREA, staff misconduct and UDC Policy & Procedure." This response to Plaintiff J.L.'s reports was directly contrary to Plaintiff J.L.'s clearly established constitutional rights, Utah law, administrative rules, and written policies and procedures of UDC. Specifically, Utah Admin. Code R251-714-3(2) requires UDC and USCF to ensure "the confidentiality of offender sexual assault complaints and the protection of offenders who make complaints of sexual assault"; there would be no confidentiality in making her complaints to the officers and supervisors involved in her management and supervision.

109.    Defendants have obstructed the grievance process by (a) failing to respond within the mandated time period; (b) returning grievances on improper grounds; (c) claiming, falsely, that Plaintiffs refused to meet with OMR teams; (d) refusing to provide information to inmates about any alternative means of reporting sexual assaults; and (e) retaliating against inmates for making lawfully protected reports of abuse.

110.    Administrative remedies are unavailable where prison administrators thwart the process through machination or misrepresentation. Defendants' conduct rendered further administrative exhaustion efforts futile.

### FIRST CAUSE OF ACTION

*42 U.S.C. § 1983 —Eighth Amendment to the United States Constitution — Sexual Assault*

(Against Defendants Kilpack and Tuipulotu)

111.    The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment.

112.     By clearly established law, a correctional officer's intentional sexual contact with an inmate or coercion of the inmate to participate in sexual acts for the purpose of sexual gratification or humiliation violates the inmate's rights under the Eighth Amendment.

113.     Defendant Kilpack, acting under color of state law, subjected Plaintiff J.L. to repeated unwanted sexual contact and coerced her to perform sexual acts for the purpose of Kilpack's sexual gratification and the humiliation of Plaintiff J.L.

114.     Defendant Kilpack, acting under color of state law, coerced Plaintiff K.S. to aid and observe Kilpack's sexual assault of J.L. for the purpose of Kilpack's sexual gratification and the humiliation of Plaintiffs J.L. and K.S.

115.     Defendant Tuipulotu, acting under color of state law, subjected Plaintiffs J.L. and K.S. to repeated unwanted sexual contact, sexual exposure, and coercion to perform sexual acts on Tuipulotu and each other for the purpose of Tuipulotu's sexual gratification and the humiliation of Plaintiffs J.L. and K.S.

116.     There is no legitimate penological purpose for sexual contact between a correctional officer and an inmate.

117.     There is no legitimate penological purpose for requiring an inmate to aid and observe the sexual assault of another inmate.

118.     There is no legitimate penological purpose for requiring an inmate to perform sexual acts upon another inmate.

119.     The actions of Defendants Kilpack and Tuipulotu were objectively harmful.

120.     Defendants Kilpack and Tuipulotu acted with a culpable state of mind, exploiting their authority to intentionally inflict sexual abuse, degradation, and psychological harm upon Plaintiffs J.L. and K.S.

121.	Due to the inherent power imbalance between correctional officers and incarcerated individuals, Plaintiffs could not legally or factually consent.

122.	As a direct and proximate result of the unconstitutional conduct of Defendants Kilpack and Tuipulotu, Plaintiffs J.L. and K.S. suffered severe psychological harm, mental anguish, emotional distress, and physical symptoms.

## SECOND CAUSE OF ACTION

*42 U.S.C. § 1983 — Eighth Amendment to the United States Constitution —*

*Failure to Protect Against Sexual Assault*

(Against Defendants Garcia, D'Amico, Zorn, Beers, Coombs, Gehman, and Hardy)

123.	Prison officials have an affirmative duty to protect inmates from violence and sexual abuse at the hands of officers.

124.	The Supervisor Defendants had actual and subjective knowledge of the substantial risk of sexual abuse posed by Defendants Kilpack and Tuipulotu and other predatory guards. This knowledge was derived from, including but not limited to, systemic risks caused by understaffing and limited camera coverage, inmate complaints, PREA reports, disciplinary write-ups, officer reports, and observation and reporting of Defendants Kilpack and Tuipulotu utilizing blind spots and being present in inmate areas to which they were not assigned.

125.	Within the USCF, Defendant Kilpack repeatedly assaulted Plaintiff J.L. for a period of months and Defendant Tuipulotu sexually assaulted numerous inmates, including Plaintiffs J.L. and K.S., for a period of months. This was possible due to widespread deliberate indifference to the safety and rights of inmates as described herein, including but not limited to the Supervisor Defendants' conduct in that they ignored inmate complaints, ignored and obstructed PREA

27

grievances and reports, ignored anomalies in the behavior and whereabouts of Kilpack and Tuipulotu, failed to remedy systemic risks of understaffing and camera limitations, and oversaw, allowed, and cultivated a pervasive culture permitting and allowing unconstitutional conduct.

126.    That deficient and unconstitutional culture, and its associated customs and practices, were widely known by the Supervisor Defendants and perpetuated, ratified, and condoned by them. On information and belief, the Supervisor Defendants' knowledge of sexual assaults and the risk of further sexual assaults is evidenced by, among other facts,  the failure to remedy camera blind spots which were known to be highly dangerous, ignoring cross-gender privacy and safety protocols, responding to inmate complaints by punishing the inmate rather than investigating the culpable conduct and taking preventative measures, failing to take appropriate actions in response to reports by inmates, failing to ensure inmates had access to adequate reporting measures, failing to take appropriate actions in response to reports by officers, participating in the destruction of evidence, deterring inmate reports of sexual assaults, and conducting sham investigations.

127.    Despite their knowledge, the Supervisor Defendants acted with deliberate indifference to the rights of Plaintiffs J.L. and K.S., including through their failure to initiate timely sexual assault investigations, failure to separate the predatory guards from vulnerable inmates, failure to adequately supervise and discipline the guards, failure to adequately train staff to prevent such abuses, and failure to mitigate known blind spots within the housing units.

128.    The Supervisor Defendants had the power and duty to alleviate the conditions that led to the constitutional violations suffered by Plaintiffs J.L. and K.S., but they failed and refused to alleviate the conditions.

129.     The Supervisor Defendants were responsible for ensuring that guards were trained and supervised to maintain the constitutional rights of inmates. Instead, the Supervisor Defendants created, condoned, and failed to remedy a custom, culture, and practice that encouraged and failed to prevent sexual abuse by guards.

130.     The Supervisor Defendants' knowledge with regard to the conduct of Defendant Kilpack included, without limitation, that prior to the abuse of Plaintiff J.L. he was disciplined for multiple failures to maintain appropriate safety barriers between staff and inmates.

131.     As a direct and proximate result of the Supervisor Defendants' deliberate indifference, failure to train, and failure to supervise, Plaintiffs J.L. and K.S. suffered severe sexual abuse and trauma.

## THIRD CAUSE OF ACTION

*42 U.S.C. § 1983 — Fourth and Fourteenth Amendments to the United States Constitution —*

*Unreasonable Search and Seizure*

(Against Defendants Garcia, D'Amico, Zorn, Beers, Coombs, Gehman, Hardy, and involved

John Doe Officers)

132.     The Fourth Amendment to the United States Constitution, as applied through the Fourteenth Amendment, protects individuals, including incarcerated persons, from unreasonable searches and invasions of bodily privacy.

133.     Under clearly established law, cross-gender strip searches such as those alleged herein infringe an inmate's privacy rights unless the search is justified by exigent circumstances.

134.     The May 13, 2025 "Reset" operation was executed without any exigent circumstances or immediate security threats that would justify an aggressive cross-gender mass

strip search. In fact, the purpose of the Reset operation was to retaliate against and intimidate Plaintiffs and other inmates.

135.    Defendants compelled incarcerated women, including Plaintiffs J.L. and K.S., to strip naked, squat, and cough in the unobstructed view of male guards and supervisors, who actively observed the searches without a legitimate penological necessity.

136.    The highly intrusive, humiliating, and physically aggressive search violated Plaintiffs' constitutional rights to bodily privacy.

137.    On information and belief, one or more of the guards video-recorded the naked inmates on body-worn cameras. The recording of a cross-gender strip search fundamentally alters the manner of the search, severely increasing the intrusiveness and harm of the search with no legitimate penological purpose. The fact of recording added severe humiliation, fear, intimidation, and emotional distress to the search.

138.    Defendants acted with deliberate indifference to the rights of Plaintiffs and the other inmates. The search was planned, authorized, condoned, and supervised by the Supervisor Defendants. Defendants were subjectively aware of the clearly established rights of inmates to be protected, including under provisions of PREA and its equivalents under Utah law, against cross-gender strip searches in the absence of exigent circumstances, of which there were none. Despite their knowledge, Defendants planned and participated in the unconstitutional mass strip search.

139.    As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiffs suffered extreme humiliation, degradation, and emotional distress.

**FOURTH CAUSE OF ACTION**

*42 U.S.C. § 1983 — Fourteenth Amendment to the United States Constitution —*

*Procedural Due Process*

(Against Defendants D'Amico, Coombs, and Hardy in their Individual and Official Capacities)

140.     The Fourteenth Amendment prohibits state actors from depriving individuals of liberty or property without due process of law.

141.     After the sexual assaults by Kilpack were made known to the Supervisor Defendants, and as a direct result thereof, Plaintiff J.L. was placed in maximum-security segregation for approximately four months without a preliminary disciplinary hearing or the opportunity to present a defense.

142.     Prisoners indefinitely confined to administrative segregation are entitled to meaningful, periodic reviews of their segregation status.

143.     Defendants affirmatively denied Plaintiff J.L. access to the Offender Management Review (OMR) process, permanently depriving her of meaningful status reviews.

144.     This retaliatory segregation imposed an atypical and significant hardship on Plaintiff J.L. and directly caused the rescission of her earned release date by preventing her from completing required programming.

145.     The Supervisor Defendants authorized, ratified, and condoned the unconstitutional segregation of Plaintiff J.L. with deliberate indifference to her constitutional rights.

146.     As a direct and proximate result of this due process violation, Plaintiff J.L. suffered a prolonged deprivation of liberty and resulting emotional distress.

**FIFTH CAUSE OF ACTION**

Utah Constitution Article I, Section 9 — Unnecessary Rigor

(Against All Defendants)

147.    Article I, Section 9 of the Utah Constitution guarantees that persons arrested or imprisoned shall not be treated with unnecessary rigor.

148.    A flagrant violation of this clause occurs when an act presents an obvious and known serious risk of harm to the imprisoned person and the official acts without reasonable justification.

149.    The systemic sexual predation by Defendants Kilpack and Tuipulotu, the retaliatory isolation of Plaintiff J.L., and the mass strip search orchestrated by the Supervisor Defendants subjected Plaintiffs to needlessly harsh, degrading, and dehumanizing treatment constituting unnecessary rigor.

150.    These acts presented an obvious and known serious risk of psychological and physical harm, and Defendants acted without any legitimate penological justification.

151.    As a direct and proximate result of these flagrant violations, Plaintiffs suffered severe injury, entitling them to damages under the Utah Constitution.

**PUNITIVE DAMAGES**

152.    The actions of the Defendants, acting under color of state law, were motivated by an improper motive and intent and involved a reckless and callous indifference to the clearly established rights of the Plaintiffs.

153.    The Supervisor Defendants exhibited deliberate, reckless, and callous indifference to known, severe risks of harm.

154.    The Supervisor Defendants acted with malicious intent by weaponizing the USCF's disciplinary system to chill constitutional rights. Pursuant to an unconstitutional policy, practice,

and custom—that was with deliberate indifference to the clearly established rights of inmates, created, condoned, and ratified by the Supervisor Defendants—officers deliberately issued punitive OMR write-ups to retaliate against inmates who attempted to invoke their constitutionally protected rights.

155.    The Supervisor Defendants engaged in a coordinated effort to humiliate, mock, and psychologically degrade Plaintiffs.

156.    The Defendants operated with a brazen and intentional disregard for clearly established law, fueled by an institutional custom of impunity.

157.    Accordingly, Plaintiffs J.L. and K.S. are entitled to an award of punitive damages for each of the causes of action described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants, jointly and severally, as follows:

1. For special damages in reasonable amounts for past, present, and future medical and mental health expenses and for other economic and pecuniary harms and losses;

2. For general damages in a reasonable amount for physical, mental, and emotional injury, pain, and suffering; lost enjoyment of life; reduced ability to enjoy activities of life; and other harms and losses;

3. For punitive damages against all Defendants, in an amount sufficient to punish them for their willful, malicious, and recklessly indifferent conduct, and to effectively deter these defendants and other officers from engaging in similar constitutional abuses in the future;

4. Reasonable attorney fees and costs pursuant to 42 U.S.C. § 1988 and otherwise;

5.  For other general and special damages, costs and expenses, interest on damages, and other relief as may be appropriate in the circumstances.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims and have submitted the jury fee.

**DATED** this 15th day of May, 2026:

> DEWSNUP KING OLSEN WOREL HAVAS
> /s/ *Walter M. Mason*
> Walter M. Mason
> *Attorneys for Plaintiffs*